**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**
**EAST SAINT LOUIS DIVISION**

| | |
|---|---|
| **THOMAS GUARINO, Individually and On Behalf of All Others Similarly Situated,**<br><br>**Plaintiff,**<br>**v.**<br><br>**DRAFTKINGS, INC. and FANDUEL INC.**<br><br>**Defendants.** | **JURY TRIAL DEMANDED**<br><br>**CASE NO. 3:15-cv-1123** |

## CLASS ACTION COMPLAINT

**COMES NOW**, Plaintiff, Thomas Guarino ("Plaintiff"), individually and on behalf of all others similarly situated, by and through undersigned counsel, and brings this class action against Defendants DraftKings, Inc. ("DraftKings"), and FanDuel Inc. ("FanDuel") (collectively "Defendants") to obtain damages, restitution, injunctive relief, and other relief described more fully below from Defendants. Plaintiff makes the following allegations upon information and belief, except as to their own respective actions, the investigation of their counsel, and the facts that are a matter of public record.

## INTRODUCTION

1.      This is a class action complaint, brought pursuant to Rule 23 of the Federal Rules of Civil Procedure, against Defendant DraftKings and Defendant FanDuel, two companies operating daily fantasy sports ("DFS") websites in a manner that violates Illinois, New York and Massachusetts law.

2.      DFS is a non-regulated industry where individuals compete against other individuals in fantasy sports games on a daily basis. That is, Defendants operate tournaments

where individuals accumulate points based on the real-life statistics of players in professional sporting events that occur on a particular day. Individuals can play for free or pay money to compete for cash prizes.

3. The start of the 2015 NFL season saw a huge media blitz as Defendants spent more than $100,000,000 on television ads and became two of the top television advertisers in the United States. As a result of this advertising blitz, Defendants added millions of new users. [1]

4. Defendants make money on the fee they take from each entry into their contests. While the prize pools of these contests are funded from entry fees, Defendants often guarantee prize pools, and will pay out the difference between the guarantee and the entry fees.

5. The difference between the entry fees in the prize pool and the guarantee is called the "overlay" and gives Defendants additional incentive to attract as many users and entries as possible into contests to avoid having to pay out this overlay, or to have their own employees win prize pool money through inside information.

6. DraftKings refers to its new users as "fish" and relies on new users who lack skill to keep its most active users – and therefore profitable entry fee generators – on their site.[2] According to one analysis, the top 1.3% of players paid 40% of the entry fees, and the most active 6.3% of players paid 76% of entry fees.[3]

7. The CEO of FanDuel also recognized the need to attract as many new, inexperienced players as possible to keep its most profitable players happy.[4]

---

[1]  http://blogs.wsj.com/cmo/2015/09/16/are-draftkings-and-fanduel-bombarding-fans-with-too-many-ads/  (accessed Oct. 7, 2015)

[2]  *Id.*;  *see also*  https://rotogrinders.com/threads/dk-frequent-player-points-130623; https://rotogrinders.com/threads/draft-kings-emails-your-opponents-to-edit-their-lineups-8230-269716?page=5; (accessed Oct. 7, 2015) (posts by user JRobs, the online screen name for DraftKings CEO Jason Robins)

[3]  http://www.sportsbusinessdaily.com/Journal/Issues/2015/07/27/Opinion/From-the-Field-of-Fantasy-Sports.aspx (accessed Oct. 7, 2015)

[4]  https://rotogrinders.com/threads/my-name-is-nigel-eccles-ceo-of-fanduel-ask-me-anything-381899?page=10 (accessed Oct. 8, 2015)

8.      Defendants allowed their employees to use material, non-public, valuable data and information to gain an enormous edge over competitors on their co-Defendant's website and, in turn, knowingly allowed their co-Defendant's employees to compete against their own players, including Plaintiff and the proposed classes, using material, non-public, valuable data and information.

9.      At all relevant times, Defendants failed to disclose to Plaintiff and the Classes the material fact that Defendants allowed their employees to use material, non-public, valuable data and information to gain an enormous edge over competitors on their co-Defendant's website and the material fact that, in turn, Defendants knowingly allowed their co-Defendant's employees to compete against their own players, including Plaintiff and the proposed classes, using material, non-public, valuable data and information.

10.     DraftKings and FanDuel both communicated to customers that their employees were not allowed to play on their own sites, but omitted the material fact that they were allowed to play on other sites and that other sites' employees were allowed to play on their site.

11.     Defendants also failed to disclose the fact that employees with access to confidential, internal data were winning large amounts of money on other DFS sites.

12.     At all relevant times, Defendants misrepresented that their DFS contests were contests of skill when, in fact, the games were not contests of skill.

13.     Prior to the disclosure of these material omissions and misrepresentations, Plaintiff and the Classes deposited money into the DFS accounts that Plaintiff and the Classes would not have deposited had they known of the material omissions and material misrepresentations.

14.     These material misrepresentations and omissions fraudulently induced Plaintiff and the proposed classes to give Defendants money, which ultimately went to Defendants and their

employees through fees and contest prizes.

## PARTIES, JURISDICTION AND VENUE

15.     Plaintiff, Thomas Guarino, is a citizen of the state of Illinois, residing in the village of East Alton.  Plaintiff deposited money into Defendant's daily fantasy sports account to participate in fantasy sports contests of skill and lost money as a result of Defendants' unfair and/or deceptive conduct described more fully herein.

16.     Defendant DraftKings, Inc. is a Delaware corporation with its principal place of business in Boston, Massachusetts.

17.     Defendant FanDuel Inc. is a Delaware corporation with its principal place of business in New York, New York.

18.     Draft Kings, Inc. conducts business in 45 states, including Illinois, and the District of Columbia.

19.     From computers and other devices, consumers in Illinois access Defendants' websites, pay money to a Defendant, and engage in paid daily fantasy sports competitions with other contestants for cash prizes in an array of contests.

20.     This Court has subject matter jurisdiction over this matter pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) and (6), in that:

a.    the matter in controversy exceeds $5,000,000.00, exclusive of interest and costs;

b.    this is a class action involving 100 or more class members; and

c.    this is a class action in which at least one member of each Plaintiff class is a citizen of a State different from at least one Defendant.

21.     This Court may exercise personal jurisdiction over Defendants because Defendants have sufficient minimum contacts in Illinois.  In particular, Defendants intentionally avail

themselves of the markets within Illinois through the advertising, promotion, sale, and marketing in this District of its daily fantasy sports websites and daily online fantasy sports tournaments and contests of skill, thus rendering the exercise of jurisdiction by this Court proper and necessary.

22.      This Court has personal jurisdiction over DraftKings and FanDuel under the Illinois long-arm statute, 735 ILCS 5/2-209, because DraftKings and FanDuel engaged in, and continues to engage in, solicitation or service activities within the State of Illinois.

23.      Venue is proper in this District under 28 US.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in this District.  Plaintiff resides in this District and Defendants have advertised, marketed, sold, and committed violations of Illinois and other states' laws within this District.

## FACTUAL BACKGROUND

### A.  Daily Fantasy Sports

24.      Defendants are able to operate their websites because they market DFS as a game of skill, like chess or the stock market.  It is also similar to pari-mutuel horse race wagering in that players compete against each other for prize pools and Defendants take their fee from the prize pool itself.

25.      Defendants held themselves out to Plaintiff and the classes as places where their skill made a difference between winning and losing.  For instance, in a television commercial (available at https://www.youtube.com/watch?v=VDa-cDu8KYg) that ran in August 2015, DraftKings advertised "every week, use your knowledge and showcase your skills….you like football, you like winning."   In another commercial in August 2015 (available at https://www.youtube.com/watch?v=bfCm6PJuL5I), DraftKings advertised its website as "a game within the game, that requires a different set of skills…we don't just play, we are players, we train,

and we win."

26.     Similarly, FanDuel advertised (available at http://www.ispot.tv/ad/AVPC/fanduel-com-one-week-fantasy-football-get-paid-for-knowledge) that players could "get paid for [their] knowledge" if they were "smarter than the average fan."

27.     In reality, most of the money on DFS sites goes to a few individuals at the top.  An analysis of publicly available data by Sports Business Daily found that in the first half of the 2015 Major League Baseball season, 91% of profits were won by just 1.3% of players.[5]  An analysis done by Bloomberg showed a similar distribution heavily weighted towards the top 1% of players.[6]

**B.  Value of Inside Information and Data**

28.     DFS customers play against each other by choosing a line-up of players at certain positions until they have reached a "salary cap" for their team, and then entering tournaments with entry fees as low as 25 cents and as high as $5,300.  The players whose fantasy teams score the most points – based on the real statistics of those players in that game – win the most money.

29.     DFS is not gambling because of the skill involved in picking a winning team. According to Robins, DraftKings attracts players "who are analytical and favor data and research." Robins said: "They do their homework.  It's like the stock market. They enjoy looking at something and trying to figure out something that someone else doesn't see."[7]

30.     The biggest edges any player can have comes from having data and information. DraftKings and FanDuel employees have access to both things, neither of which are public.  For instance, DraftKings performs analytics to determine winning strategies, return on investment of

---

[5]     http://www.sportsbusinessdaily.com/Journal/Issues/2015/07/27/Opinion/From-the-Field-of-Fantasy-Sports.aspx (accessed Oct. 7, 2015).
[6]     http://www.bloomberg.com/news/articles/2015-09-10/you-aren-t-good-enough-to-win-money-playing-daily-fantasy-football (accessed Oct. 7, 2015)
[7] Howard Stutz, *DraftKings CEO Compares Fantasy Sports to Chess, Stock Investing*, Las Vegas Review-Journal, (Sept. 29, 2015), available at http://www.reviewjournal.com/business/casinos-gaming/draftkings-ceo-compares-fantasy-sports-chess-stock-investing (last visited Oct. 7, 2015)

certain strategies, and even how lineups on FanDuel would do if they were entered into DraftKings contests.  DraftKings knows the value of this data and knows that it should not be shared: "The reason that I don't want to give the actual numbers is because I believe it creates a slippery slope where people start requesting stats on win rates of various strategies, which I believe is not a positive thing… That said, I really don't think site owners should be sharing stats on winning vs. non-winning strategies.  Part of what makes this a skill game is that people who are skilled at it can figure out for themselves how to win consistently. And on that note, I do also want to point out that skilled stacking is absolutely a winning a strategy on DK. There are plenty of people who stack and win very consistently."[8]  He went on to point out: "A lot of mixed teams that are winning on other sites would fade the stacks on DK and win if they were just entered. But they are not being entered. Take a look at some other site winning lineups and add it up for DK, you'll see it happening."[9]

31.     In addition to years of data on optimal strategies, which gives Defendants' employees a huge advantage over even the most "skilled" DFS players, Defendants' employees also have real-time access to data on current lineups of every player in every contest, and the overall ownership percentages of every player.

32.     Defendants also set player pricing through certain proprietary models, and this data provides them with details about the value of certain players that other contestants do not have.

33.     Because the goal is to beat the other players, a player with statistical data about ownership percentages of competitors would have an edge over players without this data in many ways, including the ability to make rosters with enough players different from competitors' rosters.

34.     Indeed, a DraftKings employee accidentally posted ownership percentages online

---

[8] https://rotogrinders.com/threads/dk-stacking-tonight-8230-129959?page=5 (accessed Oct. 7, 2015)
[9] https://rotogrinders.com/threads/dk-stacking-tonight-8230-129959?page=7 (accessed Oct. 7, 2015)

before they were supposed to be publicly available – that is, before all of the contestants' lineups were "locked" and could therefore still be changed.  This employee initially claimed he was "the only person with this data and as a [DraftKings] employee, am not allowed to play on site."[10]

35.   However, the same week that he posted roster data before he was supposed to, this same employee played on FanDuel and beat 229,883 entrants, coming in 2nd and personally winning $350,000.[11]  An analysis of this employee's previous DFS history shows a remarkable increase in winnings since moving from a job with rotogrinders.com covering DFS to inside DraftKings working for a DFS company.

36.   DraftKings and FanDuel, in concert, said that this employee beating 229,883 people the same week it was clear he had access to ownership data was a "coincidence."[12]

37.   DraftKings employees have won at least $6,000,000 playing at FanDuel in, which is more than one million dollars per year considering DraftKings is only a few years old.[13]  The ability of FanDuel to calculate that information within days of public knowledge shows that FanDuel can track which players are from other DFS sites and can track how much they are winning, losing, or otherwise what the possibility is that other DFS employees are using non-public information, data, and insider strategic information.

38.   DraftKings was well aware of its employees playing at FanDuel and was aware that some of its employees made more money from winnings on FanDuel than their actual salaries.[14]

39.    FanDuel profiled one of its own employees who played on other sites and had won

[10] https://rotogrinders.com/threads/draftkings-ownership-leak-850584?page=1#reply-850635 (accessed Oct. 7, 2015).
[11] http://larrybrownsports.com/fantasy/ethan-haskell-draft-kings-fanduel-profile/276741 (accessed Oct. 7, 2015).
[12]  http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasy-sports-but-didnt-expect-uproar/ (accessed Oct. 7, 2015)
[13] http://www.businessinsider.com/draftkings-daily-fantasy-sports-fanduel-2015-10 (accessed Oct. 7, 2015)
[14]                    https://www.bostonglobe.com/business/2015/10/05/draftkings-bans-employees-from-competitors-sites/s36ig5e0eV0OR9C55R8hwL/story.html (Oct. 7, 2015)

$50,000 in a short period of time, but has since removed the article from its website.[15]

40.     Robins admitted that he "had reservations" about allowing employees to play on other sites and allowing other sites' employees to play on his site, and even spoke to his competitors about ending the practice, but ultimately decided, in concert with his competitors, to continue the practice.  Robins said: "And I, to be honest, did have some reservations about this, and have spoken in the past with some of our competition about whether we should have policies such as this one in place."[16]

41.     In that same article, Robins admitted that numerous employees have access to data that could give players an advantage, including customer service and engineering workers.

42.     Robins had previously discussed[17] any sort of issue that affected "game integrity" as fraud, and literally the first person to respond is the employee who won $350,000:

[15]  http://www.engadget.com/2015/10/05/draftkings-fanduel-face-questions-about-insider-trading/  (accessed  Oct.  7, 2015)
[16]  http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasy-sports-but-didnt-expect-uproar/ (accessed Oct. 7, 2015)
[17]          https://rotogrinders.com/threads/ok-industry-wide-concern-this-is-not-directed-at-any-single-85017?page=1 (accessed Oct. 7, 2015).

**JRobs**                                                                    2 years ago



*DraftKings CEO*

This is a very interesting topic. One of the things DraftKings has been talking about from day 1 is fraud prevention, and while I cannot speak for other sites, I would imagine that many of the basic steps we have taken have been adopted by most. There is a whole category of payment fraud and identity fraud that we focus on, but I will focus here on the game integrity question since that is the one that was raised.

First off, we built our customer support tools interface so that the same rules that apply to players on the site also apply to what our customer service representatives can do. In this case, that means that when games start and rosters lock, changes are no longer possible for either party. We have had people contact us claiming their screen "locked early" before they could make a swap and asking us to do it for them. Unfortunately, even if we wanted to, our customer support team literally can't do this.

However, it is possible that someone on our tech team could manually go into the database and change something by writing code. Aside from simply being VERY selective about who we give database access, we recognize that there is a need to protect against fraud here. Not only could a rogue employee be disruptive, but someone could attempt to hack the database, as well. I cannot go into detail about what exactly we do here, but we have put a lot of safeguards in place to prevent this. Additionally, we have very strong monitoring tools and reports that flag suspicious activity or things that simply should never be happening on the site, such as a lineup change made later than a contest start time. There are many other things we look for, as well, and we have actually caught a few players that were attempting fraud. A good sign to me is that every one of them has been caught immediately following their first fraud attempt and each one has been banned from the site by pretty much any identifiable characteristic – name, username, address, and even IP address.

Of course, fraud is an issue that (as Cal mentioned with poker) is naturally going to be a lightning rod for the DFS industry as it grows. I would love to see the sites start to band together on these things to help put current players at ease and make new players more comfortable giving DFS a try. I know within certain industries, fraud techniques are widely shared amongst competition, and I think it serves all of us well to minimize fraud on anyone's sites, not just our own. One no-brainer to me is some sort of public exchange between sites and affiliates of "known fraudster" lists. There is no reason why someone banned from one site should easily be able to go play on another. This is something we have talked about a lot internally, so I'd be interested to hear if other site reps out there think there might be broader interest within the industry in getting something like this going?

                                                                    Reply  Quote  Link

**Ethan**                                                                    2 years ago



*DraftKings Rep*

Awesome detailed response, Jason.

                                                                    Reply  Quote  Link

43.     In that post, Robins uses the word "fraud" or "fraudster" nine times.  Robins also discussed how sophisticated its data analysis and fraud prevention efforts were, including tracking users by their Internet Protocol, or IP, addresses.  Thus, DraftKings could easily monitor users who worked for FanDuel or other sites to determine their winnings and whether there existed the possibility they were using inside information.

44.     For instance, an analysis by DFS Report shows that an employee at FanDuel who works in product operations is one of the top 50 players in all of DFS, despite only playing on one site.[18]  While there is no evidence this employee had access to ownership data, this individual won more than $50,000 in the early part of the baseball season on other sites.  One of his jobs includes setting player prices, which gives him detailed daily information about pricing models and could help him identify inefficiencies or opportunities on other sites.  While the article has been removed from FanDuel's website, a version is still on the internet.  In that article, the FanDuel employee profiling the FanDuel employee noted: "The fact Boccio does not play on FanDuel against you folks is a good thing.  He clearly has a winning strategy…or 10."[19]

45.     According to Legal Sports Report, an "industry insider who wished to remain anonymous told LSR that 'a significant number of the whales at the top DFS sites are employees – often executives – of other sites.' (From a DFS operator's point of view, a "whale" is simply a high-volume player that generates significant revenue, not necessarily a winning or losing player.)"[20]  FanDuel's CEO admitted to personally playing on competitor sites.[21]

46.     Had Plaintiff and/or members of the proposed classes known that Defendants were

---

[18] https://dfsreport.com/6898/follow-up-to-draftkings-fanduel-mishaps/ (accessed Oct. 7, 2015)
[19] http://www.engadget.com/2015/10/05/draftkings-fanduel-face-questions-about-insider-trading/ (Oct. 7, 2015)
[20] http://www.legalsportsreport.com/4548/draftkings-data-leak-faq/ (Oct. 7, 2015)
[21] https://rotogrinders.com/threads/my-name-is-nigel-eccles-ceo-of-fanduel-ask-me-anything-381899?page=3 (Oct. 7, 2015)

working in concert to allow employees of DFS sites to play against them, Plaintiff and members of the proposed classes would not have played on Defendants' websites.

47.    Had Plaintiff and/or members of the proposed classes known that Defendants had acted in concert to sanction this practice, Plaintiff and members of the proposed classes would not have played on Defendants' websites.

48.    Prior to the disclosure of the material fact that DFS employees were playing with inside information, Plaintiff deposited money into Defendants' DFS accounts and lost money.

49.    After disclosure of the fact that employees with access to confidential, internal data were winning large amounts of money on other DFS sites, DraftKings and FanDuel issued numerous joint and/or identical statements on their websites, continuing to act in concert.

50.    DraftKings and FanDuel both communicated to customers that their employees were not allowed to play on their own sites, but omitted the material fact that they were allowed to play on other sites and that other sites' employees were allowed to play on their site.

51.    Ultimately, Defendants together changed their internal rules to both prevent their employees from playing on other DFS sites and to prevent DFS employees from playing on their sites.

### C.    <u>Invalidity of Arbitration Provision of Terms of Use</u>

52.    DraftKings's Terms of Use is not a valid, enforceable contract.

53.    Plaintiff and the class were fraudulently induced into placing money onto DraftKings because it was supposed to be a fair game of skill without the potential for insiders to use non-public information to compete against them.

54.    The so-called "Terms of Use" do not constitute a valid, mutual agreement because the promises made by DraftKings are illusory.  Indeed, there is no restriction on DraftKings' ability

to terminate the "agreement" or to refuse to perform.  For example, the so-called "Terms of Use" provide that DraftKings and related individuals such as officers and directors are released from any liability for any claim by the user "whatsoever": By entering into a Contest or accepting any prize, entrants, including but not limited to the winner(s), agree to indemnify, release and to hold harmless DraftKings, its parents, subsidiaries, affiliates and agents, as well as the officers, directors, employees, shareholders and representatives of any of the foregoing entities (collectively, the "Released Parties"), from any and all liability, claims or actions of any kind whatsoever, including but not limited to … [examples of various types of liability listed].

55.     Another reason why the so-called "Terms of Use" is an illusory contract is that it purports to reserve to Defendant the right to deny service to any user for any reason "whatsoever": "DraftKings reserves the right, in its sole and absolute discretion, to deny any contestant the ability to participate in head-to-head contests for any reason whatsoever."  Thus, DraftKings is not bound to any performance obligation.

56.     Yet another reason why the so-called "Terms of Use" is an illusory contract is that it purports to give DraftKings the right, "without prior notice," to "revoke any or all of your rights granted hereunder."  Thus, once again, DraftKings is not bound to any performance obligation.

57.     The Terms of Use purport to require arbitration, but gives DraftKings the exclusive right to revoke the arbitration provision because it states that "Any claim or dispute between you and DraftKings that arises in whole or in part from the Terms of Use, the Website or any Contest shall be decided exclusively by a court of competent jurisdiction located in Suffolk County, Massachusetts."

58.     In addition, a user only has to check a box saying he or she has read the Terms of Use to sign up for the website, and the deposit of money and entry into contests is done through

separate transactions.

59.     The Terms of Use are procedurally and substantively unconscionable.

60.     As a direct and proximate result of the actions described above, Plaintiff and members of the proposed classes have been damaged.

## CLASS ALLEGATIONS

61.     Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this class action on behalf of the following National Class and/or State Sub-Class, collectively referred to as the "Classes":

**National Class**

All persons in the United States who deposited money into a DraftKings account before Oct. 6, 2015 and competed in any contest where other entries were made by employees from DraftKings, FanDuel or any other DFS site.

**Illinois Sub-Class**

All persons in the United States who deposited money into a DraftKings account before Oct. 6, 2015 and competed in any contest where other entries were made by employees from DraftKings, FanDuel or any other DFS site.

62.     Excluded from the Class are: (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendants or Defendants' parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Class; (4) any person who has had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

63.     Plaintiff reserves the right to modify or amend the definition of the proposed Class and to modify, amend, or remove the proposed subclass before the Court determines whether certification is appropriate and as the parties engage in discovery.

64.  **Numerosity—Fed. R. Civ. P. 23(a)(1).**  The Class is comprised of over 100 people and possibly thousands of individuals who were Defendants' customers, the joinder of which in one action would be impracticable.  The exact number or identification of the Class members is presently unknown.  The identity of the Class members is ascertainable and can be determined based on Defendants' records.

65.  **Predominance of Common Questions of Law and Fact—Fed. R. Civ. P. 23(a)(2), 23(b)(3).**  Questions of law and fact common to the Class predominate over questions affecting only individual Class members, and include, but are not limited to, the following:

a)  Whether Defendants made the material representations set forth above and substantially similar material representations to Plaintiff and members of the proposed classes;

b)  Whether Defendants made the material omissions set forth above and substantially similar material omissions to Plaintiff and members of the proposed classes;

c)  Whether Defendants' advertisements were false, misleading, or unfair;

d)  Whether Defendants owed duties to Plaintiff and the proposed classes, the scope of those duties, and if they breached those duties;

e)  Whether Defendants fraudulently induced Plaintiff and the proposed classes into using their website, depositing money into the DSF accounts, and participating in the DSF contests under false pretenses, through material misrepresentations, or through material omissions;

f)  Whether consumers were harmed by Defendants' actions as described above;

g)  Whether the Terms of Use are unconscionable, illusory, fraudulent, or otherwise invalid;

h) The extent of the damages caused by Defendants' acts;

i) Whether Defendants' employees used non-public data and/or non-public information to gain an advantage at DFS sites, whether Defendants acted in concert to condone, allow, or promote this practice, whether Defendants were negligent in allowing employees to access and use confidential data, or whether Defendants were negligent or committed fraud in failing to disclose to Plaintiff and the proposed classes that these practices were occurring; and

j) Whether Defendants violated Illinois state consumer protection statutes and the consumer protection statutes of other states.

66. **Typicality—Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of those of the Class in that Plaintiff, like all Class members, deposited money into one of Defendants' online fantasy sports accounts, participated in a DSF contests where other entries were made by employees from DraftKings, FanDuel or any other DFS site, and have been subject to losses as a result of Defendants' unfair and deceptive trade practices and/or breaches of common law duties. Plaintiff's damages are consistent with those suffered by Class members.

67. Plaintiff's claims are typical of those of the other Class members because Plaintiff, like every other Class member, was induced to use Defendants' websites and participate in contests based on false and misleading advertisements of fair play and lack of information about having to compete against players with inside information.

68. The claims of the Class Representative Plaintiff are furthermore typical of other Class members because Plaintiff has the same claims as other class members and have the same interest in seeking a refund or other damages from Defendants.

69. **Superiority—Fed. R. Civ. P. 23(b)(3).** The class action is the best available

16

method for the efficient adjudication of this litigation because individual litigation of Class Members' claims would be impracticable and individual litigation would be unduly burdensome to the courts.  Plaintiff and members of the Class have suffered irreparable harm as a result of Defendant's bad faith, fraudulent, deceitful, unlawful, and unfair conduct.  Because of the size of the individual Class members' claims, no Class members could afford to seek legal redress for the wrongs identified in this Amended Complaint.  Without the class action vehicle, the Class would have no reasonable remedy and would continue to suffer losses, as Defendants continue to engage in the bad faith, unlawful, unfair, and deceptive conduct that is the subject of this Complaint, and Defendants would be permitted to retain the proceeds of its violations of law.  Further, individual litigation has the potential to result in inconsistent or contradictory judgments.  A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

70.     Plaintiff does not anticipate any difficulty in the management of this litigation.

71.     **Adequacy---Fed. R. Civ. P. 23(a)(4); 23(g)(1).**   Plaintiff is an adequate representatives of the Classes because Plaintiff fits within the class definition and Plaintiff's interests do not conflict with the interests of the Members of the Class Plaintiff seeks to represent. Plaintiff is represented by experienced Class Counsel.  Class Counsel have litigated numerous class actions, and Plaintiff's counsel intends to prosecute this action vigorously for the benefit of the entire Class.  Plaintiff and Class Counsel can fairly and adequately protect the interests of all the members of the Class.

## COUNT I – NEGLIGENCE

72.     Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

73.     DraftKings owed duties to Plaintiff and the proposed classes as a user and paying customer of its site to use reasonable care to provide true, reliable, and accurate information and contests.

74.     DraftKings breached its duties to Plaintiff and the proposed classes by failing to prevent persons with inside information and data, by virtue of their employment at other DFS sites, from competing against Plaintiff and the proposed classes.

75.     In the course of their business, profession, and employment, Defendants and their agents, representatives, and employees supplied false information to Plaintiff, the proposed classes.

76.     Plaintiff and the proposed classes justifiably relied upon the information supplied by Defendants, and, as a result, engaged in business with Defendants and lost money.

77.     Defendants failed to use reasonable care in communicating the information about safety and security of data, employee access to data and ability of employees to use material, non-public data to compete against Plaintiff and the proposed classes on other DFS websites and contests, or allow employees of other companies with material, non-public access to compete on the DFS website where Plaintiff and the proposed classes competed.

78.     As a direct and proximate result of Defendants' negligence, Plaintiff and the proposed classes were damaged in an amount to be proven at trial.

## COUNT II
## FRAUD, MISREPRESENTATION,
## AND MISREPRESENTATION BY OMISSION

79.     Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

80.     Defendants knowingly made material representations that were false, that

defendants knew were false, were reckless as to the veracity, and/or should have known were false. Defendants made these material representations for the purpose of inducing Plaintiff and the class to act upon them.  Plaintiff justifiably relied on these material misrepresentations.

81.   Defendants knowingly omitted and/or were reckless in not knowing and/or should have known material facts for the purpose of inducing Plaintiff and the class to act upon them. Plaintiff justifiably relied on these material omissions.

82.   Specifically, and as detailed above, Defendants represented that their contests were fair games of skill.  Defendants also willfully failed to disclose that employees, agents, owners and/or others with non-public information, data and access to Plaintiff and the proposed classes' submissions would use this information to compete against Plaintiff and obtain an enormous increased chance to win, thereby greatly decreasing Plaintiff and the classes' ability to use skill to win.

83.   At all relevant times, Defendants misrepresented that their DFS contests were contests of skill when, in fact, the games were not contests of skill.

84.   Additionally, at all relevant times, Defendants failed to disclose to Plaintiff and the Classes the material fact that Defendants allowed their employees to use material, non-public, valuable data and information to gain an enormous edge over competitors on their co-Defendant's website and the material fact that, in turn, Defendants knowingly allowed their co-Defendant's employees to compete against their own players, including Plaintiff and the proposed classes, using material, non-public, valuable data and information.

85.   DraftKings and FanDuel both communicated to customers that their employees were not allowed to play on their own sites, but omitted the material fact that they were allowed to play on other sites and that other sites' employees were allowed to play on their site.

86.     Defendants also failed to disclose the fact that employees with access to confidential, internal data were winning large amounts of money on other DFS sites.

87.     Prior to the disclosure of these material omissions and misrepresentations, Plaintiff and the Classes deposited money into the DFS accounts that Plaintiff and the Classes would not have deposited had they known of the material misrepresentations and material omissions.

88.     These material misrepresentations and omissions fraudulently induced Plaintiff and the proposed classes to give Defendants money, which ultimately went to Defendants and their employees through fees and contest prizes.

89.     Plaintiff and the proposed classes acted in reliance on the false, material representations and omissions made by Defendants, which caused them injury.

90.     Plaintiff and the proposed classes would not have deposited money or engaged in any activity on Defendants' websites if they had known that they were competing against individuals with insider knowledge, access, and use of non-public data.

91.     Defendants were aware that the integrity of the games was a material fact in inducing Plaintiff and the proposed classes to give them money in exchange for services and agreeing to the alleged contract.

92.     As a result of Defendants' fraudulent representations and fraudulent omissions, Plaintiff and the proposed classes were induced into depositing money into a DFS account and playing a contest that they otherwise would not have played, and suffered financial injury, harm, and damages as described in this Complaint.

## COUNT III – VIOLATION OF THE ILLINOIS CONSUMER PROTECTION ACT

93.     Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

94.     At all times relevant hereto, the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*. ("ICFA") was in full force and effect.  Section 2 of the ICFA provides in relevant part as follows:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use of or employment of any deceptive, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use of employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby, In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

ILCS 505/2 (footnotes omitted)

95.     Plaintiff and other members of the Illinois Class, as defined above, are consumers within the meaning of the ICFA given that Defendant's business activities involve trade or commerce, are addressed to the market generally, and otherwise implicate consumer protection concerns.

96.     Section 2 of the ICFA, 815 ILCS 505/2, renders unlawful the "use or employment of any deception [including the] concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact ... in the conduct of any trade or commerce…"

97.     Defendants knowingly made material representations that were false, that defendants knew were false, were reckless as to the veracity, and/or should have known were false. Defendants made these material representations for the purpose of inducing Plaintiff and the class to act upon them.  Plaintiff justifiably relied on these material misrepresentations.

98.     Defendants represented that their contests were fair games of skill.  Defendants also willfully failed to disclose that employees, agents, owners and/or others with non-public

information, data and access to Plaintiff and the proposed classes' submissions would use this information to compete against Plaintiff and obtain an enormous increased chance to win, thereby greatly decreasing Plaintiff and the classes' ability to use skill to win.

99.     At all relevant times, Defendants misrepresented that their DFS contests were contests of skill when, in fact, the games were not contests of skill.

100.     Additionally, at all relevant times, Defendants failed to disclose to Plaintiff and the Classes the material fact that Defendants allowed their employees to use material, non-public, valuable data and information to gain an enormous edge over competitors on their co-Defendant's website and the material fact that, in turn, Defendants knowingly allowed their co-Defendant's employees to compete against their own players, including Plaintiff and the proposed classes, using material, non-public, valuable data and information.

101.     DraftKings and FanDuel both communicated to customers that their employees were not allowed to play on their own sites, but omitted the material fact that they were allowed to play on other sites and that other sites' employees were allowed to play on their site.

102.     Defendants also failed to disclose the fact that employees with access to confidential, internal data were winning large amounts of money on other DFS sites.

103.     Prior to the disclosure of these material omissions and misrepresentations, Plaintiff and the Classes deposited money into a DFS account that Plaintiff and the Classes would not have deposited had they known of the material misrepresentations and material omissions made by Defendants.

104.     Defendant intended to be deceptive and/or unfair to Plaintiff and the Illinois Sub-Class by intentionally making the foregoing false and misleading statements and omitting material information as alleged above, because had Defendant provided accurate information, Plaintiff and

the Class members would not have deposited money into Defendant's daily fantasy sports accounts and would not have entered into the contest "of skill."

105.    Defendants' practices as described herein are both unfair acts and deceptive and are prohibited by the ICFA.

106.    Plaintiff and the Illinois Sub-Class members justifiably relied on the misrepresentations and omissions to their detriment as described herein by depositing money into Defendant's daily fantasy sports accounts and playing DFS contests through Defendants.

107.    The above-described deceptive and unfair acts offend public policy and cause substantial injury to consumers.

108.    As a direct and proximate result of the foregoing, the Plaintiff and the Illinois Sub-Class members have been damaged in an amount to be determined at trial, including compensatory damages and other miscellaneous incidental and consequential damages.

109.    Plaintiff and the Illinois Sub-Class members seek damages, together with appropriate punitive damages, attorneys' fees, costs of suit pursuant to the ICFA as well as any equitable relief to enjoin Defendant from engaging in the wrongdoing described herein.

**COUNT IV**
**VIOLATIONS OF STATE STATUTES**
**PROHIBITING UNFAIR AND DECEPTIVE ACTS AND PRACTICES**

**(On Behalf of Plaintiff and the Class)**

110.    In the event the Court declines to certify a nationwide Class, Plaintiff brings this claim solely on behalf of Class members who reside in Illinois.

111.    Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

112.    The state deceptive trade practices acts were enacted by the various states following

23

the passage of the Federal Trade Commission Act ("FTC Act"), which prohibits deceptive acts and practices in the sale of products to consumers. The state laws in this area are modeled on the FTC Act and are therefore highly similar in content.

113.    Defendant's actions, as set out above, violate the Deceptive Trade Practices Acts of the various states.  Defendant has engaged in deceptive practices by representing that goods and/or services have characteristics and benefits that they do not have; representing that goods and/or services are of a particular standard, quality, or grade when they are of another; advertising goods and/or services with intent not to sell them as advertised; and engaging in other conduct which similarly creates a likelihood of confusion or of misunderstanding.

114.    The conduct described throughout this complaint constitutes unfair or deceptive trade practices predominantly and substantially affecting the conduct of trade or commerce throughout the United States in violation of the state deceptive trade practices acts and other similar state statutes prohibiting unfair and deceptive acts and practices.  The deceptive trade practices acts violated by Defendant are set forth in the next paragraph.

115.    The violations of the various state consumer protection acts (Alabama: the Alabama Deceptive Trade Practices Act (Ala. Code §8-19-1 *et seq*.); Alaska: Alaska Unfair Trade Practices and Consumer Protection Act (Alaska Stat. §45.50.471 *et seq*.); Arizona: the Arizona Consumer Fraud Statute (Ariz. Rev. Stat. Ann. §44-1521 *et seq*.); Arkansas: the Arkansas Deceptive Trade Practices Act (Ark. Code Ann. §4-88-101 *et seq*.); California: the California Consumers Legal Remedies Act (Cal. Civ. Code § 1750, *et seq*.), the California Unfair Business Practices Act (California Business & Professions Code §17200, *et seq*.), and the California False Advertising Law (Cal. Bus. & Prof. Code § 17500, *et seq*.); Colorado: the Colorado Consumer Protection Act (Colo. Rev. Stat. §6-1-101 *et seq*.); Connecticut: the Connecticut Unfair Trade Practices Act

24

(Conn. Gen. Stat. §42-110a *et seq*.);  Washington, D.C. the Consumer Protection Procedures Act (D.C. Code Ann. §28-3901 *et seq*.); Florida: the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. Ann. §501.201 *et seq*. (West)) and the Florida False Advertising Statutes (Fla. Stat. Ann. §817.40 *et seq*. (West)); Georgia: Uniform Deceptive Trade Practices Act (Ga. Code Ann. §10-1-370 *et seq*.); the Fair Business Practices Act (Ga. Code Ann. §10-1-390 *et seq*.); and the False Advertising Statute (Ga. Code Ann. §10-1-420 *et seq*.); Hawaii: The Hawaii Federal Trade Commission Act (Hawaii Rev. Stat. §480 *et seq*.) and the Uniform Deceptive Trade Practice Act (Hawaii Rev. Stat. §481A *et seq*.); Idaho: the Idaho Consumer Protection Act (Idaho Code §48-601 *et seq*.); Illinois: the Illinois Consumer Fraud and Deceptive Business Practices Act (815 Ill. Comp. Stat. Ann. §505/1 *et seq*. (Smith Hurd)) and the Uniform Deceptive Trade Practices Act (815 Ill. Comp. Stat. Ann. 510/1 *et seq*. (Smith Hurd)); Indiana: the Deceptive Consumer Sales Act (Ind. Code Ann. §24-5-0.5-1 *et seq*. (Burns)); Iowa: the Iowa Consumer Fraud Act (Iowa Code Ann. §714.16 (West)); Kansas:  the Kansas Consumer Protection Act (Kan. Stat. Ann. §50-623 *et seq*.); Kentucky: the Consumer Protection Act (Ky. Rev. Stat. §367.110 *et seq*.); Louisiana: the Unfair Trade Practices and Consumer Protection Law (La. Rev. Stat. Ann. §51:1401 (West)); Maine: the Maine Unfair Trade Practices Act (Me. Rev. Stat. Ann. Tit. 5 §206 *et seq*.) and the Uniform Deceptive Trade Practices Act (Me. Rev. Stat. Ann. Tit. 10 §1211 *et seq*.); Maryland: the Maryland Consumer Protection Act (Md. Com. Law Code Ann. §§13-101 *et seq*., 14-101 et seq.); Massachusetts: the Consumer Protection Act (Mass. Gen. Laws Ann. Ch. 93A *et seq*.); Michigan: the Michigan Consumer Protection Act (Mich. Comp. Laws Ann. §445.901 *et seq*.) and the Michigan Pricing and Advertising Act (Mich. Comp. Laws Ann. §445.351 *et seq*.); Minnesota: the Consumer Fraud Act (Minn. Stat. Ann. §325 F. 69, *et seq*.); the False Statement in Advertisement Statute (Minn. Stat. Ann. §325 F. 67, *et seq*.); the Uniform Deceptive Trade Practices Act (Minn.

Stat. Ann. §325D.44, *et seq*.); and the Unlawful Trade Practices Act (Minn. Stat. Ann. §325D.13, et seq.); Mississippi: the Consumer Protection Act (Miss. Code Ann. §75-24-1 et seq.) and the False Advertising Statutes (Miss. Code Ann. §97-23-3 *et seq*.); Missouri: the Missouri Merchandising Practices Act (Mo. Rev. Stat. §407.010 *et seq*.);  Montana: the Montana Unfair Trade Practices and Consumer Protection Act (Mont. Code Ann. §30-14-101 *et seq*.); and the Statutory Deceit Statute (Mont. Code Ann. §27-1-712 *et seq*.); Nebraska: the Nebraska Consumer Protection Act (Neb. Rev. Stat. §59-1601 *et seq*.) and the Nebraska Uniform Deceptive Trade Practices Act (Neb. Rev. Stat. §87-301 *et seq*.); Nevada: the Deceptive Trade Statutes (Nev. Rev. Stat. §§598.0903 et seq., 41.600 *et seq*.);  New Hampshire: the Regulation of Business Practices for Consumer Protection Act (N.H. Rev. Stat. Ann. §358-A:1 *et seq*.); New Jersey: the New Jersey Consumer Fraud Act (N.J. Stat. Ann. §56:8-1 *et seq*. (West)); New Mexico: New Mexico Unfair Practices Act (N.M. Stat. Ann. §57-12-1 *et seq*.); New York: New York Consumer Protection Act (N.Y. Gen. Bus. Law §§349, 350 (Consol.)); North Carolina: North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. §75-1.1 *et seq*.); North Dakota: Deceptive Act or Practice Statutes (N.D. Gen. Stat. §51-15-01 *et. seq*.); Ohio:  Ohio Consumer Sales Practices Act (Ohio Rev. Code Ann. §1345.01 *et seq*. (Baldwin)); Oklahoma: Oklahoma Consumer Protection Act (Okla. Stat. Ann. Tit. 15, §751 *et seq*. (West)) and the Oklahoma Deceptive Trade Practices Act (Okla. Stat. Ann. Tit. 78, §51 *et seq*. (West)); Oregon: the Unlawful Trade Practices Act (Or. Rev. Stat. §646.605 *et seq*.) and the Oregon Food and Other Commodities Act (Or. Rev. Stat. §616.005 *et seq*.); Pennsylvania: Unfair Trade Practices Act and Consumer Protection Law (Pa. Stat. Ann. Tit. 73 §201-1 *et seq*. (Purdon); Rhode Island: Consumer Protection Act (R.I. Gen. Law §6-13.1-1 *et seq*.); South Carolina: South Carolina Unfair Trade Practices Act (S.C. Code Ann. §39-5-10 *et seq*.); South Dakota: South Dakota Deceptive Trade Practices and Consumer Protection Law

(S.D. Codified Laws Ann. §37-24-1 *et seq*.); Tennessee: Tennessee Consumer Protection Act (Tenn. Code Ann. §47-18-101 *et seq*.); Texas: Texas Deceptive Trade Practices Act (Tex. Bus. & Com. Code Ann. §17.41 *et seq*. (Vernon)); Utah:  Utah Consumer Sales Practices Act (Utah Code Ann. §13-11-1 *et seq*.) and the Utah Truth in Advertising Act (Utah Code Ann. §13-11a-1 *et seq*.); Vermont: Vermont Consumer Fraud Statute (Vt. Stat. Ann. Tit. 9, §2451 *et seq*.); Virginia: Virginia Consumer Protection Act (Va. Code 59.1-196 *et seq*.); Washington: Washington Consumer Protection Act (Wash. Rev. Code Ann. §19.86 *et seq*.); West Virginia: West Virginia Consumer Credit and Protection Act (W. Va. Code §46A-6-101 *et seq*.); Wisconsin: Wisconsin Fraudulent Representations Act (Wis. Stat. Ann. §100.18 *et seq*. (West)); Wyoming: Consumer Protection Act (Wyo. Stat. §40-12-101 *et seq*.)) have directly, foreseeably, and proximately caused damages to Plaintiff and proposed class in amounts yet to be determined.

116.    As a result of Defendants' violations of the Deceptive Trade Practices Acts of the various states prohibiting unfair and deceptive acts and practices, Plaintiff and members of the proposed class have suffered actual damages for which Defendant is liable.

## COUNT V – CIVIL CONSPIRACY

117.    Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

118.    As detailed above, the Defendants engaged in a corrupt or unlawful combination and/or agreement with each other to do an unlawful act, and continued to act in concert after the act was discovered.

119.    Specifically, by affirmatively agreeing to allow competitors' employees to play on their own sites against their own players and concealing and not disclosing this to Plaintiff and the proposed classes, Defendants committed negligence and/or fraud.

27

120.    This overt act was done pursuant to or in furtherance of the conspiracy to allow their employees and officers to profit, continue to attract new players to their websites, and otherwise profit because of their unlawful activities.

121.    FanDuel knew that its employees played on DraftKings and DraftKings knew that its employees played on FanDuel.

122.    Defendants gave each other assistance and encouragement in accomplishing the tortious result of having their employees compete against and beat players on other DFS sites.

123.    As a direct and proximate result of Defendants' concerted actions, Defendants are both liable to Plaintiff and the members of the proposed classes.

### COUNT VI - UNJUST ENRICHMENT

124.    Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

125.    Plaintiff and the members of the proposed classes conferred a benefit on Defendants by depositing money and playing in contests on their websites.

126.    Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff's and the members of the proposed classes deposits and contest entries, which retention under these circumstances is unjust and inequitable because Defendants misrepresented the facts concerning the fair play available on their websites.

127.    Plaintiff and members of the proposed classes were injured as a direct and proximate result of Defendants' misrepresentations and omissions because Plaintiff and the class members deposited money into Defendant's DFS accounts and paid for entry into contests "of skill", which they would not have done had they known the true facts.  Because Defendants' retention of the non-gratuitous benefit conferred on them by Plaintiff and the members of the

28

proposed classes is unjust and inequitable, Defendants must pay restitution to Plaintiff and the members of the proposed class for Defendants' unjust enrichment, as ordered by the Court.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, prays for judgment against Defendants granting the following relief:

a.  An order certifying this case as a class action and appointing Plaintiff's counsel to represent the Class;

b.  For an order awarding a full refund of all money paid to Defendants as part of the invalid contract.

c.  For an order awarding Plaintiff's and class members' actual, statutory, punitive, or any other form of damages provided by statute;

d.  For an order awarding Plaintiff's and class members' restitution, disgorgement, or other equitable relief provided by statute or as the Court deems proper;

e.  For an order awarding Plaintiff and the class members pre-judgment and post-judgment interest;

f.  For an order awarding Plaintiff's and the class members' reasonable attorney fees and costs of suit, including expert witness fees; and

g.  For an order awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all causes of action so triable to the extent authorized by law.

Date: <u>October 9, 2015</u>                        By: <u>   s/Corey D. Sullivan                    </u>
                                        Corey D. Sullivan
                                        SULLIVAN LAW LLC
                                        1814 E. Eagle Bay Drive
                                        Bloomington, Indiana 47401
                                        Tele: 314-971-9353
                                        Email: sullivcd@gmail.com

                                        D. Todd Mathews, 6276652

Megan Meyers, 6309754
GORI JULIAN & ASSOCIATES, P.C.
Attorneys at Law
156 N. Main St.
Edwardsville, IL  62025
Tele: 618/659-9833
Fax: 618/659-9834
Email: todd@gorijulianlaw.com

**ATTORNEYS  FOR  PLAINTIFF  AND
THE PROPOSED CLASSES**